2023 IL App (2d) 210653
No. 2-21-0653
Opinion filed January 23, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-226 |
| JUAN D. MORA, | ) ) | Honorable Debra D. Schafer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, defendant, Juan D. Mora, was convicted of first-degree murder and three counts of aggravated discharge of a firearm. He appeals the trial court's partial denial of his motion to suppress statements made to police during a custodial interrogation. Defendant contends that all of his statements, including his confession, should have been suppressed. He argues that detectives used an improper "question first, warn later" technique and that his waiver of *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)) was not knowing and voluntary. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant was charged with the first-degree murder of Za'Shawn Coats (720 ILCS 5/9-1(a)(2) (West 2018)) and three counts of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), at Stefan Smith, Richie Baker, and Kenneth Palmer, respectively, on January 21, 2019. Prior to a jury trial, defendant filed a motion to suppress statements made to detectives while in interrogative custody on January 23, 2019. The motion alleged that defendant did not knowingly and understandingly waive his *Miranda* rights, rendering any statements elicited by detectives in violation of his constitutional rights.

¶ 4      On September 30, 2019, the trial court held a hearing on defendant's motion to suppress. Rockford police detective Michelle Bootz was first called by the State to testify. Bootz interviewed defendant at the Rockford Police Department, District 2,on January 23, 2019. The interview was recorded, and the video was admitted into evidence as People's Exhibit No. 1. The interview began after patrol officers transported defendant to District 2 after a traffic stop. At 2:42 p.m., Bootz and Detective John Wassner began the interview by asking defendant preliminary biographical questions about his name, date of birth, address, and employment. She noted that defendant did not appear to be under the influence of any intoxicants. Defendant appeared mentally competent and could speak, read, and write in English.

¶ 5      Several minutes into the interview, at 2:46 p.m., Wassner presented to defendant a form containing the *Miranda* warnings. People's Exhibit No. 2, the *Miranda* form signed by defendant, Bootz, and Wassner, was admitted into evidence. The form indicated that it was signed at 2:47 p.m. Defendant initialed next to each of his constitutional rights, to acknowledge that he understood them. Defendant did not ask questions concerning his *Miranda* rights when signing the form.

¶ 6     Bootz testified that the interview lasted well into the evening of January 23. The detectives would periodically step out of the interview room. While alone in the room, defendant would "sometimes just sit at the table, we'd provide him with food *** [h]e'd lay down, put his head down, take a nap." Defendant was allowed to use the restroom when needed and was offered food and water. He never exhibited any signs of distress while in the room. Bootz recalled that defendant never indicated that he did not understand the line of questioning. Defendant was told that he had an active arrest warrant from a prior traffic offense and would be going to the Winnebago County Jail. He did not ask to have an attorney present or tell the detectives that he wanted to stop talking to them. Bootz did acknowledge that, at one point during the interrogation, defendant asked if he should have a lawyer present.

¶ 7     On cross-examination, Bootz admitted that detectives were aware of the following information about defendant before presenting him with the *Miranda* form: (1) a vehicle of the type owned by defendant, a black Pontiac G6, was involved in the shooting and had a uniquely identifiable pattern of snow on the rear bumper on the day of the shooting, (2) defendant worked at NAPA Auto Parts and his vehicle was photographed there by police, (3) he was involved in gang activity, and (4) he matched the description of the shooting suspect, described as having a red tattoo on his cheek. Bootz acknowledged that she and Wassner asked defendant questions related to that information before presenting him with the *Miranda* form.

¶ 8     Bootz further acknowledged that Wassner told defendant that he was not in any trouble and the detectives just needed his help with an investigation. Wassner also told defendant that the *Miranda* form was given to everyone the police speak with at the station, as a formality. Before defendant finished reading the final line of the form, Wassner said, "If you understood, just sign there indicating you understood, easy-peasy." After signing the form, Wassner reiterated to

defendant that the detectives needed his help with an investigation. Defendant ultimately confessed to being the shooter.

¶ 9 After the close of evidence, the trial court acknowledged that it had viewed the video of the interview prior to the hearing and wanted to do so again before making its ruling.

¶ 10 On November 7, 2019, the trial court denied defendant's motion to suppress in part and granted the motion in part.[1] Relevant here, the trial court made the following findings as to the voluntariness of defendant's statements:

> "The detectives presented the defendant with People's Exhibit No. 2 which is the *Miranda* form. [Defendant] did read the first line out loud in English. Detective Wassner read the remaining rights and told him to initial after each if he understood which he did without fail and without question.
>
> The defense has argued that it is not a knowing and voluntary waiver because the detectives downplayed the significance of the *Miranda* warnings and by telling him he was not in any trouble. It is clear that they did do those things. But from very early on once they got into why the defendant was there, it was clear that he was there concerning an investigation into the death of the boy in this case. Of course, we know now that the police suspected it was him because of the red C tattoo on his face not just his car. But they were not obligated to lay out their whole case to him in the beginning so that the defendant could

---

[1]People's Exhibit No. 1, the video admitted at the hearing on defendant's motion to suppress statements, was not included with the record on appeal. However, the trial court's detailed findings as to the content included therein allows this court to adequately consider the issues raised on review related to that evidence.

then determine whether or not he wanted to talk to them.

> The defendant perhaps not realizing how much they knew in an effort to be cooperative so as not to raise suspicion cooperated and eventually put himself at the scene. The defendant could have demanded an attorney or refused to speak anymore once he realized they had more information and when they confronted him that it was—they did not believe his story about there being a different shooter *** but he did not. And, of course, he later went on to identify himself as the shooter.

> The Court does find based on the totality of the circumstances that the statements made to Detectives Wassner and Bootz were voluntary."

In ruling that the detectives' pre-*Miranda* questions regarding defendant's car and tattoo were inappropriate and would be suppressed, the trial court made the following relevant findings:

> "The defense had made issue with the fact of the nature of the questioning that went on before *Miranda*. And I do find that some of those questions were very specific to the case and *** were not appropriate to be asked prior to him being *Mirandized*. I think the second question was about his tattoo which I can infer you'd have a better idea than I how much information they had. I don't know what all the witnesses were saying. The question was is that a new tattoo and, you know, rolling over on a pillow and that sort of thing that's clearly not a usual question somebody would ask. But later on, in that same biographical questioning, the officers asked if he was in a gang and the defendant mentioned the tattoo, he pointed to it and acknowledged that he is a Latin Count ***. They also go on to ask about what car he drives which I don't think would be some standard question, I think, that's a case specific kind of question. How's that in the snow? And whose is it? And that sort of thing to me all the questions concerning the car are questions that should have come

after *Miranda*. And so, if the State chooses to play the video or seeks to play the video or elicits questions from the detectives concerning this interview, they will not be permitted to ask concerning the car, the questions about the car prior to *Miranda*. To the extent it was discussed later, yes, they can go into it. But the fact that it was covered prior to *Miranda*, I don't believe it was appropriate at that time. I think the fact that they discussed the tattoo was harmless given that it comes up later, given that he mentions it himself. But I'm willing to rule that they would have to delete the audio portion where he's talking about is that a new tattoo? Did it hurt rolling over on the pillow that kind of stuff? At the very beginning if you, again, I think, it would end up being harmless because it's all discussed later on but after *Miranda* but, I think, those were too case specific and should not have gone in, been gone into prior to *Miranda*."

¶ 11    On May 4, 2021, the matter proceeded to a jury trial. The State first called Kenneth Palmer to testify to the events of January 21, 2019. He, along with Za'Shawn Coats, Richie Barker, and Stefan Smith had the day off from school and decided to meet up at a building owned by Barker's father, to hang out. The boys then began walking to Baker's house and reached the corner of Ferguson and Kent Streets. Palmer recalled that St. Anthony's Church was located across the street from where they were standing at the intersection. A black car drove up towards the curb next to where the boys were standing. A Hispanic male with a red tattoo on his face and long hair asked them if they were Latin Kings, to which the boys answered that they were not. Palmer then "heard a gun cock," followed by two shots. Palmer said that he "laid down" in the street behind an ice block "so I had something in between me and the bullet." The car drove off and Palmer went to check on Coats, who was lying in the street. When Palmer tried to pick Coats up, he noticed Coats

was bleeding from the head. Palmer said he then heard another car coming through a nearby alley and ran away, first to the St. Anthony's parking lot and then to his sister's house nearby.

¶ 12　Smith was next called to testify. He testified as Palmer had to the sequence of events leading up to the shooting on January 21, 2019. He described a gray vehicle with tinted windows pulling up to the boys at the intersection. Smith testified that a "Latino" man in the passenger seat, who had a red tattoo "under his eye" and long black hair, asked them if they were Latin Kings. When they responded that they were not, Smith recalled, he heard gun shots and "jumped in the snow." He remembered sitting in the snow for "a good 30 seconds until I heard the car *** left." Smith saw Coats on the ground bleeding and ran to a nearby liquor store to call police. He told the responding officer that the shooter had a red tattoo on his face, and Smith was asked to draw a picture of it. Smith's drawing was introduced as People's Exhibit No. 27. Smith described the tattoo to police as an "SD," but clarified that the "S" could have been a "$." He believed "SD" could mean Satan's Disciples, a street gang with a presence in that area.

¶ 13　Barker testified next and recalled a silver car pull up to the boys at the intersection. He said a "Mexican" male in the passenger seat asked if the boys were Latin Kings. Barker testified that he saw a handgun in the man's hand and that he then pushed Smith out of the way and ran towards some trees. Barker recalled hearing "three [gun shots], maybe more." He then ran to his house with Smith before Smith went to the liquor store to "get a phone."

¶ 14　Officer Benjamin Johnson testified that on January 21, 2019, he was on duty when he received a ShotSpotter notification at 3:50 p.m. that gun shots had been fired approximately two blocks away from where he was on patrol. He responded to the intersection of Ferguson and Kent Streets and saw a black male, later identified as Coats, lying in the road and bleeding from the head.

¶ 15    People's Exhibit No. 4, a DVD of Johnson's squad car video, was admitted into evidence. The video depicts Johnson passing a black Pontiac on his way to the scene. He recalled the black Pontiac "looked like it was trying to get [out] of the area quickly," but as the vehicle "didn't' do anything different than what it had been, *** [he] moved on and went to go check the area further." He could not see into the vehicle when passing it, because it "was too tinted." Johnson affirmed that the black Pontiac would later be identified as the suspect vehicle.

¶ 16    Sergeant Brad Shelton testified that he was assigned to obtain surveillance video from a residence near the scene of the shooting. People's Exhibit No. 5, video from three cameras at the residence, was admitted into evidence. The video depicted a black Pontiac G6 traveling in the area, passing by the cameras several times between 3:43 p.m. and 3:49 p.m. on January 21, 2019. One of the cameras depicted two men running away from the area of the shooting at 3:51 p.m.

¶ 17    Detective Jonathan Deutsch testified that he was assigned to the gang unit of the Rockford Police Department at the time of the shooting. As part of his role in that position, Deutsch created "dummy accounts," fake social media accounts to monitor gang activity and gather intelligence. On January 22, 2019, Deutsch used one of his dummy accounts on Facebook to locate defendant's profile. The pictures of defendant on that Facebook profile depicted him with a red tattoo on his cheek, fitting the suspect's description.

¶ 18    Detective Scot St. Vincent, an accepted expert in street gang investigations with the Rockford Police Department, testified that the Latin Counts were rivals of the Latin Kings at the time of the shooting. On January 22, 2019, St. Vincent was provided details of the investigation, notably that the suspect was described as having a tattoo on his face and that the suspect asked the victims if they were Latin Kings. St. Vincent stated that it is very common for members of one street gang to travel into the territory of a rival and look for individuals who could be members.

St. Vincent confirmed that the area, including the intersection of Ferguson and Kent Streets, is Latin Kings territory.

¶ 19    St. Vincent testified that the Latin Counts and the Satan Disciples were both bitter rivals of the Latin Kings in January 2019. Both the Latin Counts and the Satan Disciples had a history of traveling into Latin Kings territory and conducting "missions similar" to that described by the victims in the present case. At the time of the shooting, the Latin Counts were the only Hispanic gang to utilize the colors black and red. Their tattoos tend to use "Old English style font." The description of the shooter prompted St. Vincent to look at members of the Satan Disciples and the Latin Counts as part of his investigation. Deutsch provided St. Vincent with defendant's Facebook profile depicting him with a red tattoo on his cheek. St. Vincent was familiar with defendant as a Latin Count from St. Vincent's previous gang-related investigations and identified him in open court.

¶ 20    St. Vincent was aware that defendant worked at a NAPA warehouse, so he went there on January 22, 2019, with another detective, to speak with the assistant manager. The assistant manager informed them that defendant drove a black Pontiac G6 to work. The detectives located a black Pontiac G6 in the employee parking lot. People's Exhibits Nos. 13 and 14, photographs t. Vincent took at approximately 11:30 a.m. on January 22, 2019, of the black Pontiac G6 in the employee parking lot were admitted into evidence. The photographs showed the vehicle with snow impacted on the rear driver's side of the bumper to the left of the license plate.

¶ 21    On cross-examination, St. Vincent admitted that the initial report he received contained information that the suspected shooter's tattoo was of an "SD" and that the "S" looked like a "$." On redirect, St. Vincent testified that he eliminated Satan Disciple members as suspects because their colors are yellow and black. He stated that "Satan Disciples would never put a red tattoo on

their face." At the time of the shooting, defendant "was the only individual member of the Latin Counts that was a Hispanic male that we could definitively say had a red tattoo on one of his cheeks *** that was not incarcerated or otherwise unaccounted for[.]"

¶ 22    Sergeant Brian Strawser testified that he obtained the January 21, 2019, surveillance video from the NAPA warehouse. That video was admitted into evidence as People's Exhibit No. 28 and it shows defendant arriving to the warehouse at 6:05 a.m., whereupon he backed a black Pontiac G6 into a snowbank when parking. At 2:49 p.m., defendant was seen walking out of the warehouse and getting into the black Pontiac G6 before pulling out of the parking lot at 3:07 p.m.

¶ 23    Sally Finch, director of Trinity Day Care, testified that defendant picked up his daughter on January 21, 2019, at 4:42 p.m. People's Exhibit No. 25, a copy of Trinity Day Care's sign-out form from January 21, 2019, signed by defendant, was admitted into evidence.

¶ 24    Jason Catalani, manager of the NAPA warehouse, testified that defendant worked Monday through Friday from 6:00 a.m. to 2:30 p.m. He did not recall observing a tattoo on defendant's face on the day of the shooting.

¶ 25    Detective John Wassner testified to his interrogation of defendant on January 23, 2019. Wassner read defendant his *Miranda* rights and provided him with a copy of a form marked, "Your Rights." He believed defendant to have understood his rights as he read them. People's Exhibit No. 23, a copy of the *Miranda* rights form, was admitted into evidence. The form shows defendant's initials next to each line and defendant's signature at the bottom, next to Wassner and Bootz's signatures.

¶ 26    Wassner testified that defendant was in the interview room at the police station for approximately 10 hours. He and Bootz spoke with defendant for "about two hours and 12 minutes." Wassner stated that, when the detectives were not in the room, defendant was provided with food,

drink, and opportunities to use the bathroom. The majority of the time that the detectives were out of the room, defendant was sleeping. People's Exhibit No. 24, a redacted video copy of defendant's interview with detectives on January 23, 2019, was admitted into evidence.[2]

¶ 27    People's Exhibit No. 24 was played for the jury and depicts as follows: the video begins at 2:48 p.m. on the day of the interview, when defendant told detectives that he left work around 3:00 p.m. on the day of the shooting and went to his father's house. He stayed there about 45 minutes before leaving to pick up his daughter from day care. He then went home. Detectives informed defendant that a car matching the type he drives was seen in the area of the shooting. Defendant denied being in that area or knowing anything about the shooting, except for what he had heard on the news. Wassner told defendant, "Alright, cool, well let's get some stuff put together and we can get you out of here in a minute." Defendant asks if he can "make a call?" Wassner responded, "Give us a minute," before walking out of the room at 3:01 p.m.

¶ 28    Detectives reentered the room at 4:19 p.m. and told defendant that they knew his vehicle was in the area of the shooting. Defendant continued to maintain that he was not in that area. At 5:46 p.m., following another break in the interview, defendant told detectives that he was driving with another Latin Count named Gunna at the time of the shooting. Defendant described Gunna as black. Gunna told defendant to pull up next to the boys. Defendant said he told Gunna not to shoot the boys but "to just check 'em." Defendant said Gunna then leaned out of the passenger

---

[2]The redacted video depicts only the time detectives were speaking with defendant. The portions when defendant was alone in the interview room were redacted, by agreement of the parties.

window and began shooting. Defendant drove away and dropped Gunna off on the west side of Rockford. He said that he has not been able to locate Gunna since then.

¶ 29    At 10:23 p.m., detectives told defendant that they knew he was alone in the car during the shooting. They told defendant that the witnesses saw a light-skinned man with long black hair. Defendant was informed that the detectives had performed a search of his phone and located text messages to a person named "Blakky" about defendant needing a new gun because he "ran up on some Kings." Defendant began repeating to detectives that he was "ready to go" to county jail instead of answering further questions.

¶ 30    At 11:24 p.m., defendant asked detectives, "Aren't I supposed to have somebody here?" Wassner asked defendant what he meant, to which defendant responded, "Like an attorney or somebody?" Wassner responded, "That's not up to us." After approximately 20 additional minutes of questioning, defendant told detectives that he was the shooter and that it was an accident. Defendant stated that he fired two shots at the boys to scare them but did not know he had hit anyone until he got home and saw a Rockford Scanner report of the incident.

¶ 31    Bootz testified that a search warrant for the contents of defendant's cell phone was obtained during the interview on January 23, 2019. Detectives reviewed the contents extracted from the phone during breaks in the interview. Those contents were admitted into evidence as People's Exhibits Nos. 32A and 32B, over defendant's objection.

¶ 32    Detective William Donato testified that detectives located multiple Internet searches on defendant's phone that were conducted at approximately 4:00 p.m. on the day of the shooting. Several searches were about whether St. Anthony's Church, located across the street from the site of the shooting, was equipped with surveillance cameras. A screen shot of the Rockford Scanner website showing a news story about the shooting was also located on the phone.

¶ 33    Donato testified that detectives reviewed the phone's text messages and found a conversation between defendant and "Blakky." Defendant sent Blakky the screen shot from the Rockford Scanner website and said, "I need to give this one up and get a new one from you." Blakky responded to defendant, "Ok." Defendant replied, "LmK ASAP just caught some kkings on the south." Donato testified that he perceived the message to mean defendant "was looking to exchange something." Notes created on the phone the morning after the shooting, called "Exposing Me Beat," contained rap lyrics that Donato stated "perhaps could have been influenced" by the shooting incident. Two "selfie-style photographs" taken on January 13 and January 17, 2019, show defendant with a red tattoo under his eye.

¶ 34    After the State rested, defendant moved for a directed verdict. The trial court denied the motion. Defendant rested and renewed his motion for a directed verdict. The trial court also denied that motion. The jury found defendant guilty of all four counts.

¶ 35    On June 7, 2021, defendant filed a motion for a new trial. The motion argued that the trial court erred in its partial denial of defendant's motion to suppress statements. The trial court denied the motion.

¶ 36    Following the trial court's imposition of defendant's sentence, he filed this timely appeal.

¶ 37                               II. ANALYSIS

¶ 38    On appeal, defendant contends that the trial court erred in its partial denial of his motion to suppress statements made to police. He argues that his post-*Miranda* statements were elicited by the detectives through an improper "question now, warn later" interrogation strategy and should have been suppressed. Defendant further argues that the waiver of his *Miranda* rights was not knowing or voluntary.

¶ 39    As an initial matter, we note that the State asserts that the record is incomplete because (1) the State introduced the full 10 hours of defendant's interview, (2) the trial court analyzed the full 10-hour video in its ruling on the motion to suppress statements, and (3) the same 10-hour video does not appear in the record—only the redacted interview video used at trial was submitted with the record. Because the record is not complete, according to the State, we must affirm on that basis. We disagree. We note that the State does not assert that the recordings contained in the record do not accurately portray all of defendant's interview with police. Further, the redacted video in the record was introduced at trial, and we may consider the entire record in reviewing the trial court's ruling on the motion to suppress. *People v. Gilliam*, 172 Ill. 2d 484, 501 (1996); *People v. Alfaro*, 386 Ill. App. 3d 271, 290 (2008). Accordingly, we hold that the record is sufficiently complete with the inclusion of the redacted interview video introduced at trial, which depicts defendant's interview with police, and we reject the State's contention to the contrary. We now turn to defendant's contentions in this appeal.

¶ 40    In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). We review *de novo* the ultimate question posed by the legal challenge to the trial court's ruling on a suppression motion. *Id.* It is proper for us to consider the testimony adduced at trial, as well as at the suppression hearing. *Id.* Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving by a preponderance of the evidence that the confession was voluntary. 725 ILCS 5/114-11(d) (West 2018); *Slater*, 228 Ill. 2d at 149.

¶ 41 A confession is voluntary if it is the product of free will as opposed to the product of an "inherently coercive atmosphere of the police station." *People v. Nicholas*, 218 Ill. 2d 104, 118 (2005). As a guard against self-incrimination, statements made in response to custodial interrogation must be suppressed unless they are preceded by *Miranda* warnings. *Miranda*, 384 U.S. at 478-79. The failure to give a defendant his *Miranda* warnings before his initial inculpatory statement does not necessarily require the suppression of later warned statements. *People v. Loewenstein*, 378 Ill. App. 3d 984, 990 (2008); *Oregon v. Elstad*, 470 U.S. 298, 314 (1985); *People v. Fuller*, 141 Ill. App. 3d 737, 743 (1986).

¶ 42 The United States Supreme Court has held that, although "*Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Elstad*, 470 U.S. at 309.

> "[A]bsent deliberatively coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Id.* at 314.

¶ 43 In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court condemned the "question first, warn later" interrogation technique and mandated the suppression of statements that resulted from use of that tactic. Under the "question first, warn later" technique, an officer initially interrogates a suspect, obtains an incriminating statement, then provides the *Miranda* warnings,

and repeats the question until the accused repeats the answer provided before the warnings. *Id.* at 611. The Court held that *Miranda* warnings given after eliciting a confession would be ineffective in conveying to a defendant the nature of his rights, including the right to remain silent, and the consequences of abandoning those rights. *Id.* at 613-14. In his concurrence, Justice Kennedy advocated a narrower test, finding the plurality's test was too broad because it applied to both intentional and unintentional two-step interrogations. *Id.* at 621-22 (Kennedy, J., concurring). In contrast, Justice Kennedy's test applied only in the infrequent cases where police deliberately employed a two-step interrogation in a calculated effort to undermine *Miranda* warnings. *Id.* at 622.

¶ 44    The *Seibert* Court recognized situations where officers do not deliberately withhold *Miranda* warnings, stating that "[a]n officer may not realize that a suspect is in custody and warnings are required. The officer may not plan to question the suspect or may be waiting for a more appropriate time." *Id.* at 620. Since *Elstad* and *Seibert* were decided, the *Elstad* standard has been applied, unless it is shown that police deliberately attempted to evade the requirements of *Miranda* by not offering those warnings until after a defendant has confessed. See *People v. Lopez*, 229 Ill. 2d 322, 360-61 (2008).

¶ 45    In *Lopez*, (*id.* at 360), our supreme court adopted Justice Kennedy's concurrence in *Seibert* as controlling authority in Illinois. *Lopez* reiterated that the relevant framework is to first determine if the police deliberately engaged in a "question first, warn later" technique during their interrogation of a defendant. *Id.* If there is no evidence supporting a finding of deliberate conduct, then the *Seibert* analysis ends. *Id.* " '[I]n determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence such as an officer's testimony, support an inference that the two-step

interrogation procedure was used to undermine the *Miranda* warning.' " *Id.* at 361 (quoting *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006)).

¶ 46    Our supreme court acknowledged that police officers generally refuse to admit on the record to using a "question first, warn later" interrogation technique to secure a confession. *Id.* However, by considering the objective evidence in addition to any subjective evidence, such as an officer's testimony, the trial court may be able to determine whether the officer employed the "question first, warn later" technique to circumvent *Miranda. Id.* To review the objective evidence, our supreme court set forth the following factors as guidelines for consideration: the timing, setting and completeness of the prewarning interrogation; the continuity of police personnel; and the overlapping content of the unwarned and warned statements. *Id.* at 361-62 (citing *Williams*, 435 F.3d at 1159).

¶ 47    Viewing the subjective evidence presented in *Lopez*, our supreme court noted that a detective involved explicitly denied using the "question first, warn later" technique. *Id.* at 362. Viewing the objective evidence, the court noted that the police brought the 15-year-old defendant into an interrogation room at the police station at approximately 1 p.m. on July 21, 1998, one week after the murder, and told him that another person, named Jose Leal, had implicated him in the murder. *Id.* After leaving the defendant for four or five hours in the interrogation room, the same detectives reinterviewed Leal, who admitted his own involvement and again implicated the defendant. *Id.* The detectives arrested Leal, returned to the police station, spoke with the defendant at 6 p.m., and again informed him that Leal had implicated him in the murder. *Id.* Without providing *Miranda* warnings, the detectives asked the defendant whether he was involved in the murder. *Id.* The defendant responded by making an oral incriminating statement. *Id.* After his

confession, detectives gave the defendant his *Miranda* warnings. The defendant subsequently gave a handwritten statement, again confessing to his part in the crime. *Id.* at 365.

¶ 48 Viewing the evidence in its totality, the supreme court determined that the detectives engaged in a "question first, warn later" interrogation when, after about five hours at the police station, the same detectives who initially confronted the defendant with Leal's statement confronted the defendant again with Leal's statement and obtained an oral confession without benefit of any *Miranda* warnings. *Id.* at 362-63. Noting the testimony of one of the detectives that defendant would not have been free to leave the police station at 6 p.m., after Leal's incriminating statement had been obtained, the supreme court stated it could "think of no legitimate reason why the detectives failed to give defendant his *Miranda* warnings prior to the 6 p.m. confrontation, other than a deliberate decision to circumvent *Miranda* in hopes of obtaining a confession, which would ultimately lead to a handwritten statement." *Id.* at 363-64.

¶ 49 Applying the *Lopez* analysis to the case at bar, we hold that there is no evidence, subjective or objective, to indicate that the detectives engaged in an intentional process to prevent defendant from asserting his *Miranda* rights or that they deliberately delayed the issuance of his *Miranda* warnings. As to the objective evidence in this case, the pre-*Miranda* questions and defendant's responses went on for only approximately five minutes. Defendant, who was not a minor, was given the *Miranda* warnings by Wassner, and then, approximately 10 hours later, confessed to the shooting. While at the police station, defendant was offered food and water. He was allowed to sleep.

¶ 50 As to the subjective evidence available here, the trial court did find that the questions concerning defendant's vehicle and tattoo were case-specific and "should have come after [*Miranda* warnings]." However, the trial court also found that the issue of defendant's tattoo was

harmless, as it came up from defendant himself, after he was given the *Miranda* warnings. None of the suppressed pre-*Miranda* statements were a confession by defendant. Defendant's pre-*Miranda* statements only corroborated information that the detectives were already aware of from their investigation of the shooting.

¶ 51    This case differs from *Siebert* and *Lopez* because, in those cases, the defendants were interrogated and provided incriminating statements *before Miranda* warnings were given. Here, on the other hand, defendant did not provide an incriminating statement until *after* being given *Miranda* warnings. The evidence here does not support a finding of deliberateness on the part of the detectives. See *Lopez,* 229 Ill.2d at 360 ("If there is no evidence to support a finding of deliberateness on the part of the detectives, our *Siebert* analysis ends."). We determine that defendant's "question now, warn later" claim lacks merit.

¶ 52    This court is unaware of any precedent suggesting that a defendant's pre-*Miranda* statements elicited by police for the purpose of obtaining corroborative information related to a crime would necessitate suppression of a post-*Miranda* confession to that crime. We do agree with the trial court that the pre-*Miranda* questioning by the detectives in this case was very case-specific and inappropriate at that stage of the interview. The questions were meant to elicit not only information corroborative of the shooting but also inculpatory statements from defendant. The trial court's findings were quite thorough, and we affirm the partial denial of defendant's motion to suppress statements. Based on the record presented to this court, including the redacted video interview with the detectives, any notion that defendant was not the person who shot and killed Za'Shawn Coats strains the credulity of even the most neutral arbiter. However, we feel it necessary to condemn the actions of the Rockford Police Department as to the detectives' inappropriate line of questioning before informing defendant of his *Miranda* rights. Further, we

caution police in general to pursue fact-specific information from suspects after having informed them of their constitutional rights.

¶ 53　We now examine defendant's contention that the waiver of his *Miranda* rights was not knowingly and intelligently given. The relevant inquiry is whether, in fact, the entire subsequent statements, after the *Miranda* warnings, were voluntarily made. *Elstad*, 470 U.S. at 318. Whether a statement is voluntary depends on if "the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." (Internal quotation marks omitted.) *Slater*, 228 Ill. 2d at 160. Reviewing courts look at the totality of the circumstances in order to determine whether a defendant understood his *Miranda* rights and made a knowing and intelligent waiver. *Id.* Among the elements considered are the accused's age, education, intelligence, experience with the criminal justice system, the length of detention and interrogations, whether the accused was advised of his constitutional rights, and whether he was mistreated or abused. *People v. Williams*, 230 Ill. App. 3d 761, 776 (1992).

¶ 54　Defendant was 24 years old at the time of the interview with the detectives. He had numerous interactions with police previously in his life and was no stranger to the criminal justice system. The detectives determined that defendant could read and speak English when they went over the *Miranda* form with him. He did not appear to have any cognitive impairments of any kind. He did not appear to be under the influence of any intoxicants. He was presented with the *Miranda* form and read the first line out loud in English. Wassner read the remaining rights and told him to initial after each if he understood, and defendant did so without question. Certainly, the detectives did not divulge to defendant that they knew as much about the facts of the shooting as they did, but they were under no obligation to do so. At any point during the nearly 10 hours

that defendant was in the interview room, he could have demanded an attorney. Nothing in the record suggests that defendant was mistreated by the detectives in any way before ultimately confessing to being the shooter. Based on the totality of the circumstances, we hold that all of defendant's statements were voluntarily made.

¶ 55    Because defendant's voluntary statements were not taken in violation of *Seibert* or our supreme court's holding in *Lopez*, we affirm the trial court's partial denial of defendant's motion to suppress statements made to police after his *Miranda* rights were fully expressed.

¶ 56                              III. CONCLUSION

¶ 57    We affirm the judgment of the circuit court of Winnebago County.

¶ 58    Affirmed.

---

*People v. Mora*, **2023 IL App (2d) 210653**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 19-CF-226; the Hon. Debra D. Schafer, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Laura Peters, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Prosecutor's Office, of counsel), for the People. |

---