2024 IL App (2d) 220327
No. 2-22-0327
Order filed June 20, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-1254 |
| TRIVEA JONES, | ) ) ) | Honorable Alice C. Tracy |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in finding defendant was not in custody when she spoke to police in her apartment; any error in the admission of defendant's custodial statement was harmless; and there was no evidence of improper question-first, warn-later tactics by the police.

¶ 2    Defendant, Trivea Jones, appeals from a judgment finding her "not not guilty" on charges of first-degree murder. Before this court, defendant challenges the trial court's decision not to suppress her inculpatory statements to the police.

¶ 3 The trial court found that: (1) defendant was not in custody when she spoke with detectives at her apartment; (2) defendant knowingly waived her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), when she spoke to detectives at the police station after her arrest; and (3) detectives did not engage in a "question-first, warn-later" interrogation, in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004).

¶ 4 We agree with the trial court that defendant was not in custody when she spoke to the police at her apartment, and therefore her non-custodial statements were admissible. We also agree with the trial court that there was no evidence indicating that police engaged in a "question-first, warn later" tactic; rather, the video and audio recorded evidence shows how the events of the day unfolded, and there is no indication of any pre- or post-custodial coercion. We need not consider the propriety of defendant's waiver after her arrest, however, because the statements defendant made in her in-custody interview were largely cumulative of her prior statements and could not have affected the outcome of her discharge hearing. In sum, the judgment is affirmed.

¶ 5                                    I. BACKGROUND

¶ 6 Following the death of her six-month old son, M.J., defendant, then age 23, was charged with two counts of first-degree murder. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2020). Shortly after the charges were filed, a *bona fide* doubt was raised about defendant's fitness to stand trial, and fitness proceedings were initiated. While the issue of defendant's fitness was pending, the defense filed a motion to suppress statements, which raised the three issues decided by the trial court. Because suppression is the only issue raised in this appeal, we confine our review to the admissibility of defendant's inculpatory statements.

¶ 7 At the suppression hearing, Aurora police officer Michael Townsend testified that he was dispatched to defendant's apartment in Aurora around 5:00 p.m. on June 21, 2019, due to a report

of an unresponsive child. When Townsend arrived, he and another officer performed CPR on M.J. until the paramedics arrived and transported M.J. to Rush Copley Hospital. Townsend then transported defendant to the hospital in his squad car. Defendant was not under arrest at the time and no handcuffs were used.

¶ 8     The five-minute ride and conversation in Townsend's squad car was recorded. There, defendant stated that M.J. had drank too much milk, and "does this" often, which led to him "turning blue." Townsend led defendant in a short prayer for M.J. Another officer, Eric Rappa testified that he heard defendant repeat that she "had given the baby milk and then he just stopped breathing." After speaking to defendant about the incident, Rappa recalled that defendant engaged in "small talk" and brought up things unrelated to her baby, such as the television show *Law & Order*.

¶ 9     Officer Jordan Hilton testified that he and Detective Tristan Hennessey spoke to defendant in the hospital's family waiting room at 6:20 p.m. The hospital chaplain was present, and the 22-minute interview was recorded. Again, defendant was not in custody at this time. During the interview, defendant stated that she worked part time in housekeeping at an area hotel. The police learned that defendant lived with her mother, her sister, and her nephew. None of defendant's family members were present after the morning, and defendant was the only one who spent time with M.J. that day. Defendant stated that her sister left for work around 8:00 a.m. and her mother left for work around 10:00 a.m. Defendant said that she watched television all day with M.J. on the floor in her nephew's bedroom. Then, around 4:00 p.m., defendant noticed M.J. was not breathing. She attempted to perform CPR and then went to a neighbor's apartment, who called 9-1-1. After speaking with the officers, defendant signed a consent for the authorities to search her apartment. It is not clear why defendant chose to leave the hospital, but the record indicates that

around this time, M.J. was airlifted to a hospital in Chicago. Hilton then drove defendant and her mother back to the apartment.

¶ 10    When Hilton, defendant, and her mother arrived at the apartment, defendant was met by Detective Jennifer Hillgoth. Hillgoth specializes in child-abuse investigations and was called in when it was discovered that M.J. had multiple skull fractures on the right side of his head. Hillgoth had already seen photographs showing the injuries to M.J.'s skull before she arrived. She knew the child was in critical condition and was suffering from intercranial bleeding.

¶ 11    Hillgoth and Hennessey then spoke to defendant in her apartment for a little more than an hour. Defendant offered the detectives could remove their shoes when they came in, and they obliged. Hillgoth also gave defendant a doll of an infant and asked her to explain what happened. At the suppression hearing, Hillgoth testified that if defendant had indicated that she did not want to talk, Hillgoth "would have honored that" request and "left the apartment."

¶ 12    The first 12 minutes of the interview were video recorded, but Hillgoth later switched to audio-only recording because she did not have enough memory or battery on her phone. The audio part of the interview was approximately 57 minutes. At the beginning of both exhibits, defendant gave her permission to record the conversation.

¶ 13    The interview was largely led by Hillgoth, who asked defendant to show "where [she] went and what [she] did" that day. Hillgoth described the conversation as "girl talk" and noted that she and defendant were laying or sitting on the floor in the bedroom and the living room during various parts of the interview. As defendant reenacted what she said she did that day, she moved freely about the apartment.

¶ 14    Hillgoth's tone and demeanor were calm throughout the interview. Hillgoth and defendant had a friendly conversation, with Hillgoth referring to defendant as "honey," "sweetie," and

"sweetheart" when addressing her. Defendant explained that her pregnancy was not complicated, and that M.J. had a normal delivery. Defendant also explained her background, that she was born in Chicago, that she had graduated high school, that M.J.'s father had not been in his life much, what she had done the day before, how she makes M.J.'s bottle, how she washes M.J., what she had for breakfast, and that she had gone to the movies the week before. Defendant told Hillgoth that she had a GED and denied having any individual education plans (IEPs) when she was in school. (The latter part turned out to be incorrect as defendant had several IEPs in school.)

¶ 15     When the conversation returned to the events of that day, defendant reiterated that she had been "watching *Law & Order* all day." Around 3:00 p.m., defendant noticed something was wrong with M.J. Defendant observed "milk coming out of his nose"; his body was stiff; his heart was beating "really, really fast" and his eyes were "half asleep."

¶ 16     At around 40 minutes into the audio portion of the interview, Hillgoth began to ask more focused questions about M.J.'s condition, explaining that "if they [hospital personnel] don't know what happened, they don't know how to help him." Hillgoth spoke about her own daughters and about being a mother herself. Hillgoth then asked "mom-to-mom *** What did his head hit ***? Because his head hit something," adding that "babies don't just stop breathing for no reason." Hillgoth pointed out that there was damage to—and possibly blood—evident on the particle board on the bottom left side of the bedroom's entertainment center. Hillgoth implored defendant to tell "[her] side" because if not, hospital personnel would see M.J.'s injuries and assume the worst.

¶ 17     Defendant then acknowledged that M.J. "hit his head on the dresser twice" while she was changing him. Defendant stated that she was "frustrated" and "[h]e was crying a lot." Defendant suggested it could have happened on accident while she rocked him. Defendant stated that she performed CPR on M.J., but it "didn't help." Meanwhile, M.J. was laying there, not breathing, for

nearly an hour. Hillgoth then asked about cuts to M.J.'s head, and defendant replied, "[s]ometimes his nails get long and he scratch [*sic*] his face."

¶ 18    Throughout the interview, defendant exhibited no apparent difficulty when answering Hillgoth's questions. Defendant's speech was not pressured and her responses were appropriate to the mood and tone of the questions posed. At the conclusion of the interview, Hillgoth arrested defendant and she was transported to the Aurora Police Department.

¶ 19    At the station, Hillgoth went to speak with defendant in her cell, and defendant agreed to speak to Hillgoth and Hennessey in an interview room. The three then went to the room. The interview began at 10:26 p.m. and was video recorded with defendant's permission. The door to the room was apparently unlocked as Hennessey walked in and out of the room at several points with ease. The interview lasted around 26 minutes. Throughout the interview, defendant was upbeat and seemingly excited to help the police. The detectives were calm, and appeared tired, but were nevertheless professional.

¶ 20    M.J. passed away several days later and a pathologist determined that he died from intracranial edema (or swelling) due to eleven distinct blunt-force injuries to his head.

¶ 21    Testifying for the defense at the suppression hearing, Dr. Elisa Lancaster of the Kane County Diagnostic Center was admitted as an expert in the field of forensic psychology. Lancaster testified that defendant had an IQ of 54, placing her in the low range of intellectual functioning for a 24-year-old woman. Lancaster characterized defendant's intellectual disability as "mild" with several deficits, "specifically abstract reasoning, executive functioning, and problem-solving."

¶ 22    Lancaster then stated that, in her opinion, defendant did not knowingly and intelligently waive her *Miranda* rights when she spoke to Hennessey and Hillgoth at the Aurora Police

Department. Lancaster administered a test, the "Standardized Assessment of *Miranda* Abilities," for defendant. Lancaster explained as follows:

"So in that particular subtest, there's three categories of terms [in the *Miranda* warnings]. There's easy, mid-range, and difficult terms. So, she answered 53 percent of the easy terms correctly; 17 percent of the mid-range; and 10 percent of the difficult terms. [S]he answered about 25 percent of the terms overall correctly."

¶ 23     Based on this assessment, Lancaster concluded that defendant was not competent to waive her right to remain silent, although Lancaster also stated that defendant is "able to communicate and indicate her needs fairly clearly and [to] articulate herself." Defendant did not testify.

¶ 24     After the parties' arguments, the trial court announced that it would deny defendant's suppression motion. The trial court found that defendant was not in custody in her apartment before her arrest, and therefore the interview was not custodial. In addition, the trial court found that defendant unequivocally understood her *Miranda* rights and chose to waive them at the police department and speak with the detectives. The court found that although defendant's understanding was not perhaps the most nuanced, the video recording showed that defendant nevertheless understood her rights and made a deliberate decision to speak with the police. Last, the court found there was no hint of improper "question-first, warn-later" tactics throughout the interviews. Accordingly, the court declined to suppress defendant's statements to the police.

¶ 25     At the discharge hearing, the foregoing evidence was admitted. At the conclusion of the hearing, the defense argued that defendant did not have the required mental state to commit murder and asked that the court consider the lesser offense of involuntary manslaughter. The court found the evidence sufficient; defendant was unfit and was proven not not guilty of first-degree murder. Pursuant to the finding, an extended five-year treatment term was imposed so that, with therapeutic

services, defendant might become fit to stand trial. See 725 ILCS 5/104-25(d) (West 2020). The trial court denied defendant's motion to reconsider and defendant timely appealed.

¶ 26                                II. ANALYSIS

¶ 27     At issue in this appeal is whether the trial court should have granted defendant's motion to suppress her statements. *Miranda v. Arizona*, 384 U.S. 436 (1966), requires the suppression of all unwarned custodial statements that were involuntary or were elicited through police interrogation. Defendant re-raises the contention that (1) she was in custody at her apartment; (2) she did not knowingly waive her rights after her arrest; and (3) that the detectives engaged in a "question-first, warn-later" strategy. The State contends: (1) defendant was not in custody when she was questioned at home and, thus, no *Miranda* warnings were required; (2) defendant willfully spoke to the police and understood she was waiving her right to remain silent; and (3) there was no evidence the police used impermissible tactics to secure defendant's confession. As we explain, we largely agree with the State.

¶ 28     In reviewing a ruling on a motion to suppress, the trial court's findings of fact are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149, (2008). We then consider *de novo* the ultimate issue of whether the statement should be suppressed. *Id.*

¶ 29     We begin with the issue of whether defendant was in custody when she made her unwarned confession in her apartment, which preceded her arrest. Like the trial court, we determine that defendant was not in custody at the time, and thus *Miranda* warnings were not required earlier. Whether a person is in custody for *Miranda* purposes compels us to examine both: (1) the circumstances surrounding the interrogation and ask (2) whether, given those circumstances, "a reasonable person, innocent of any crime," would not have felt free to terminate the interrogation

and leave. *People v. Braggs*, 209 Ill. 2d 492, 505-06 (2003); see also *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).

¶ 30　Our supreme court has identified several custody factors relevant to assessing the circumstance surrounding the interrogation, such as: "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *Slater*, 228 Ill. 2d at 150. "Other factors that courts have deemed relevant to the custody analysis include 'whether and to what extent the person has been made aware that he is free to refrain from answering questions' and 'the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed.' " *People v. Logan*, 2024 IL 129054, ¶ 60 (citing *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996)). After considering and weighing all factors, the court must make an objective determination as to whether a reasonable person, innocent of wrongdoing, would have believed he or she was not in custody, but rather free to terminate the questioning and leave. *In re D.L.H., Jr.*, 2015 IL 117341, ¶ 51 (citing *Slater*, 228 Ill. 2d at 150). When, as here, the suspect has an intellectual deficit, or is a juvenile, the reasonable-person standard is modified to take that fact into account, so we ask whether a person with defendant's intellectual functioning reasonably would have believed that they were free to not answer questions and end the encounter. See *id.*; *Braggs*, 209 Ill. 2d at 508.

¶ 31　After carefully reviewing the video and audio recordings of the interview in defendant's apartment, we agree with the trial court that defendant was *not* in *de facto* custody prior to her

arrest. The interview took place at defendant's residence. "Other things being equal, a suspect questioned in familiar (or at least neutral) surroundings does not face the same pressures as one questioned in a police-dominated atmosphere," such as a police station. *People v. Vasquez,* 393 Ill. App. 3d 185, 190 (2009) (citing 2 Wayne R. LaFave, CRIMINAL PROCEDURE § 6.6(e), at 738-39 (3d ed. 2007)). In addition, defendant was able to move freely from room to room, showing a level of comfort and security that is rarely found at a police station. *Cf. People v. Beltran*, 2011 IL App (2d) 090856, ¶ 51 (finding that questioning during psychiatric hospitalization was noncustodial).

¶ 32      We next consider the time, length, mood, and mode of the interview. The interview occurred in the early evening, and there was no indication that defendant was tired. (In fact, defendant later joked with the detectives that *they* appeared tired.) Again, there were only two officers present and the interview lasted approximately 75 minutes, which is not atypical for noncustodial questioning. See *Beltran*, 2011 IL App (2d) 090856, ¶ 41; *Vasquez*, 393 Ill. App. 3d at 192; *cf. Braggs*, 209 Ill. 2d at 514 (interrogation took place over a period of days).

¶ 33      In addition, the mood and mode of the interview weigh against a finding of custody. Detectives Hillgoth and Hennessey treated defendant with dignity and respect throughout. They did not badger defendant and did not "employ a hostile or accusatory tone." *Beltran*, 2011 IL App (2d) 090856, ¶ 42. Even after Hillgoth noticed the damage to the nightstand, and the conversation became more focused on how M.J. was injured, the detectives were calm and professional rather than confrontational.

¶ 34      There were no family or friends present at the apartment, though the record indicates that defendant's mother largely stayed outside the apartment and did not enter the conversation. Neither defendant nor her mother testified, and none of the officers who testified recalled why defendant's

mother remained outside. Thus, contrary to defendant's argument, the record does not show that the authorities *prevented* defendant's mother from being present during the interview. It may well have been that, in light of the day's events, defendant's mother deliberately chose not to go in. We simply do not know. But in any case, there was no evidence that police excluded family or friends. See *id.*, ¶ 43.

¶ 35    On this point, defendant notes that roughly 50 minutes into the interview (around 38 minutes into the audio recording), the detectives can be heard speaking to another person who may have entered. Hillgoth then asked if they could "have the room just a little longer" and immediately resumed speaking with defendant. Defendant now suggests that brief moment transformed the conversation into a custodial arrest, but we are not convinced. It is unclear from the record who Hillgoth was speaking to, or whether defendant was even aware that someone else was trying to enter the room, or what that person's purpose might have been. Again, we do not know, and we cannot make a definitive inference from the record's silence. Still, the exclusion of any one person from the room—so long as that person was not defendant's retained attorney (*People v. McCauley*, 163 Ill. 2d 414, 423-26 (1994))—does not to turn a noncustodial conversation in defendant's apartment into an incommunicado arrest.

¶ 36    "A key factor in our custody analysis is the number of law enforcement officers and authority figures who were present during the interrogation." *Logan*, 2024 IL 129054, ¶ 65. As noted, here, there were only two detectives. *Cf.*, *id.* ¶ 66 (noting that where "three police officers and two DCFS investigators were present in the apartment[,]" the interview was more apt to be custodial). Indicia of formal arrest procedures were also largely absent. Both detectives were dressed casually, and neither displayed a weapon or used an aggressive tone. Put simply, there was no evidence the police treated defendant analogously to an arrestee.

¶ 37    We do note that the police brought defendant to her apartment from the hospital, but the circumstances surrounding her transportation are unclear. Officer Hilton testified that he was asked by another officer (he did not recall who) to drive defendant and her mother home, which was roughly a five-minute trip from the hospital. We do not know whether Hilton was asked to do that specifically so that defendant could speak with detectives. The record is also unclear on how or why defendant chose to leave the hospital in the first place, or when M.J. was flown from Rush Copley to Chicago. While this factor might otherwise cause us concern, we note that there was no evidence suggesting that defendant believed she was *required* to speak with the detectives. *Cf.*, *e.g.*, *Logan*, 2024 IL 129054, ¶ 63 (where defendant testified she felt she "had" to participate in a reenactment with the police is indicative of custody); *People v. Brown*, 136 Ill. 2d 116, 127 (1990) (where language used by authorities was "more of an imperative than a request" indicated that defendant was in custody).

¶ 38    Finally, we do not believe defendant's age, intelligence, and mental makeup weigh in favor of custody. We say this with full awareness of that defendant later submitted to an IQ test and was found unfit to stand trial. As our supreme court has noted, a "[suspect's] mental deficits do not inform the *custody* analysis." *In re D.L.H., Jr.*, 2015 IL 117341, ¶ 55 (emphasis added) (citing *J.D.B.*, 564 U.S. at 274, and *Braggs*, 209 Ill. 2d at 508). Again, the purpose of our inquiry is to determine whether defendant was under *de facto* arrest and whether there was *any* police misconduct. To that extent, we find none.

¶ 39    Moreover, *Miranda*'s custody analysis does not require officers to consider circumstances that are " 'unknowable' " to them at the time of the interrogation. *In re D.L.H., Jr.*, 2015 IL 117341, ¶ 55 (quoting *J.D.B.*, 564 U.S. at 274). Rather, our case law compels that we consider the suspect's "readily discernible" characteristics and ask what was "objectively apparent" to the police at the

time of questioning. *Id.* (internal quotation marks and citations omitted). Here, as in *In re D.L.H., Jr.*, 2015 IL 117341, ¶ 55, "[o]ur own review of the *** recordings does not lead this court to conclude that [defendant's] mental deficits were objectively apparent." Both the video and audio recording of the interview demonstrate that defendant freely spoke with the police. She did not present as confused or preoccupied with her son's welfare. Nor did she seem fearful or pressured. Instead, she appeared to be well oriented while speaking to the police in familiar surroundings. Defendant manifested no difficulty in understanding Detective Hillgoth's questions and, significantly, defendant answered with clear, thoughtful, and cogent responses. Defendant answered each question as it was asked.

¶ 40    In holding that defendant was not in custody during the questioning at her apartment, we find defendant's reliance on *Braggs*, 209 Ill. 2d 492, unpersuasive. In *Braggs*, an intellectually disabled defendant was "*repeatedly* taken by officers to a law enforcement facility and questioned" (emphasis added)—six separate times—for days at a time. *Id.* at 511. The final time, the defendant made an inculpatory statement, which our supreme court held was an unwarned custodial interrogation. *Id.* Here, the defendant was not in custody. She was not at a police station when she made her unwarned statement, and she was not the victim of repeated harassment and exploitation by law enforcement officers. Thus, in contrast to *Braggs*, there was simply no evidence that would lead us to conclude that defendant reasonably believed she was under arrest or was compelled to speak with the police at the time.

¶ 41    We can also distinguish this case from our supreme court's recent decision in *Logan*, 2024 IL 129054, which was published after briefing in this case was completed. There, our supreme court explained that a reenactment by the victim's mother of the circumstances in which she "discovered" her infant son's body in her apartment was custodial as there were at least five

officials present at the time, and there was no dispute that the officers indicated that defendant's compliance with their queries was non-optional. *Id.* ¶¶ 62-64. Here, the recordings of the apartment conversation overwhelmingly show that there was no similar overreach, and thus the interview never took on a custodial dimension prior to defendant's arrest at the conclusion of the interview.

¶ 42    We can say with complete fairness that, during the apartment interview, defendant seemed genuinely motivated to explain what happened to M.J. to assist both his treatment providers and the police regardless of how that information might ultimately affect her freedom. As the trial court found, defendant was "able to communicate clearly with police officers and medical personnel" that day. Like the trial court, we, too, are convinced that defendant, despite her later low IQ scores, made a voluntary choice to speak with the detectives at her apartment and to answer their questions, rather than terminate the conversation.  Accordingly, because we conclude that defendant was not in custody when she was questioned in her apartment, we agree with the trial court that prior *Miranda* warnings were not required.

¶ 43    Defendant's next contention is that her inculpatory statements at the police station were involuntary. We agree with the State that harmless-error analysis reveals review of this issue is unnecessary. As we have repeatedly noted, defendant's statements at the apartment appear free from any sort of unlawful coercion; thus, they are subject to harmless-error analysis. See *Arizona v. Fulminante*, 499 U.S. 279, 285 (1991); *People v. Salamon*, 2022 IL 125722, ¶¶ 120-24; *People v. Wrice*, 2012 IL 111860, ¶¶ 60-63. As the State points out, the core of defendant's inculpatory statements were made during the apartment interview. True, defendant's statements at the police station put a finer point on her account from earlier, but they were cumulative of the statements she made at her apartment prior to her arrest. As the police-station interview merely reiterated the substance of defendant's earlier statements, which were not custodial and did not trigger *Miranda*,

we determine that any error in its admission of the police-station interview was harmless beyond a reasonable doubt. See, *e.g.*, *Salamon*, 2022 IL 125722, ¶ 127 ("under the particular circumstances of this case, the result of the trial would have been the same if the confession [in question] had been excluded").

¶ 44   We turn last to defendant's argument that all of her statements should be suppressed as the product of impermissible police tactics under *Missouri v. Seibert*, 542 U.S. 600 (2004). Here, too, we agree with the trial court that there was no evidence of improper tactics.

¶ 45   *Seibert* was a split decision, where the plurality opinion was narrowed by Justice Kennedy's concurring opinion. The rule that emerged from *Seibert* is that post-warning statements are inadmissible if they merely duplicate pre-warning statements intentionally elicited in an effort to evade *Miranda*. *Id*. at 622 (Kennedy, J., concurring, joined by Breyer, J.). This is known as the "question-first, warn-later" technique, and Illinois courts apply the concurrence's narrower test, which requires a finding that the officers *deliberately* withheld *Miranda* warnings. *People v. Lopez*, 229 Ill. 2d 322, 360-61 (2008); *People v. Mora*, 2023 IL App (2d) 210653, ¶¶ 41-48. "If there is no evidence supporting a finding of deliberate conduct, then the *Seibert* analysis ends." *Mora*, 2023 IL App (2d) 210653, ¶ 45.

¶ 46   We agree with the trial court that the subjective and objective evidence does not support a finding of deliberate withholding of *Miranda* warnings. At the time Detective Hillgoth interviewed defendant, Hillgoth knew that M.J. had suffered a skull fracture and was in serious condition. Hillgoth testified, and her questions in the recordings showed, that she was attempting to determine who had contact with M.J. to have inflicted those injuries. At the time Hillgoth began questioning defendant, Hillgoth could not have known defendant was a suspect rather than a possible witness. That information came only *after* speaking to defendant and *after* Hillgoth learned who had

physical access to M.J. preceding his injury.

¶ 47    Furthermore, we are again compelled to point out that defendant was not confronted multiple times, or repeatedly detained for questioning. *Cf. Lopez*, 229 Ill. 2d at 360-61; *Braggs*, 209 Ill. 2d at 511; *Mora*, 2023 IL App (2d) 210653, ¶¶ 47-48. Here, because of the recordings, we, for the most part, are able to see and hear how the events unfolded organically around defendant's noncustodial and custodial interviews—in real time—before M.J. passed. As with defendant's prior arguments, the evidence of what the detectives actually did belies the assertion that they engaged in misconduct in their dealings with defendant.

¶ 48                                    III. CONCLUSION

¶ 49    While we are sensitive to defendant's intellectual disabilities, we agree with the trial court's determination that defendant failed to show that suppression of her statements was warranted. The evidence showed that defendant was not in custody when she made her unwarned statements, that her custodial statements were immaterial to the verdict, and that police did not intentionally engage in improper interrogation techniques. For the reasons stated, the trial court did not err when it refused to suppress defendant's statements at her discharge hearing. We therefore affirm the judgment of the circuit court of Kane County.

¶ 50    Affirmed.