2025 IL App (1st) 240668-U

No. 1-24-0668

Order filed August 13, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 22 CR 10723 |
| JOSEPH CRONIN, | ) ) | Honorable Jennifer F. Coleman, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court properly denied defendant's motion to suppress evidence and statements because (1) defendant and his partner gave the police officers voluntary consent to enter their residence, (2) the officers were not required to advise defendant of the *Miranda* warnings because the officers did not conduct a custodial interrogation, (3) the officers' warrantless seizure of defendant's cellphone was lawful because probable cause existed to believe that the cellphone contained evidence of a crime and exigent circumstances existed to prevent the destruction of that evidence, and (4) the evidence obtained on defendant's cellphone was admissible pursuant to the inevitable discovery doctrine despite defendant's involuntary consent to the search of his cellphone since the officers obtained a warrant before searching the cellphone.

¶ 2     Defendant Joseph Cronin was convicted after a stipulated bench trial of 15 counts of possession of child pornography and sentenced to four years' sex offender probation and required to register as a sex offender for life.

¶ 3     On appeal, defendant argues that the trial court erred when it denied his motion to suppress because (1) the police officers' entry into his home was unlawful, (2) he was subjected to a custodial interrogation without first being administered warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), (3) the warrantless seizure of his cellphone was unlawful, and (4) the evidence on his cellphone would not have been inevitably discovered.

¶ 4     For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                    I. BACKGROUND

¶ 6     The investigation began in February 2022, when the National Center for Missing and Exploited Children issued a CyberTipLine Report concerning "unconfirmed child pornography." The tip was based on a November 15, 2021, Instagram conversation between a person alleged to be 17 years old and Instagram user "jcronin1897." During that conversation, "jcronin1897" sent a picture of his penis to the 17-year-old person. Chicago investigators executed search warrants on Instagram/Meta relating to the user "jcronin1897." Instagram provided investigators with an email address, phone number, IP address, and the name "Joseph Cronin." Using this information, investigators obtained a home address, which was to the duplexed first floor and basement unit of a three-flat building on North Artesian Avenue in Chicago.

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 7    On August 22, 2022, at about 12:28 p.m., Chicago Police Detectives Kelly Doyle and Richard King, and Chicago Police Officer Diaz arrived at that address. The officers were armed and wearing bulletproof vests, which displayed their badges. The detectives wore plain clothes, and Officer Diaz was in uniform. Officer Diaz also wore a body-worn camera (BWC), which recorded the events at issue. This recording was admitted into evidence. Defendant and his partner Aaron Flatt lived in the residence at issue.

¶ 8    The property was enclosed within a fence, and the officers entered the property through an open front gate. Detective Doyle walked up the steps to a small landing, knocked on the exterior front door of the building several times, and rang the doorbell. After waiting about one minute with no response, Officer Diaz loudly whistled while standing in front of the residence and next to the railing of the building's sunken patio. Defendant opened the basement-level sliding patio door and looked up at the officers. Detective Doyle asked defendant if he had a minute to talk to them about an investigation, and defendant responded that he was on a work telephone call that he expected would last another hour. Detective Doyle asked him how quickly his call would get "wrapped up" because they needed to talk. During this interaction, defendant's dog barked loudly at the officers. Detective Doyle said, "Hi," to the dog.

¶ 9    Defendant reentered the residence through the sliding door and the officers remained in front of the residence. While waiting outside, Detective Doyle stated to the other officers that defendant "knows exactly why we're here." Several minutes later, Mr. Flatt opened the door of his residence, which opened into a small, common area vestibule on the first floor. Then, Mr. Flatt opened the exterior front door of the building and stepped outside onto the landing while the exterior door remained open. Defendant stood outside of his residence and inside the vestibule, in

front of the open exterior door. The officers climbed the steps to the landing. Detective Doyle asked Mr. Flatt if he was "Aaron Flatt," which he confirmed. Detective Doyle said that they probably did not want her to talk on the front porch due to the nature of the conversation. Either defendant or Mr. Flatt said, "Okay," and defendant asked if it was bad. Detective Doyle replied that it was not great. Defendant asked who it was about, and Detective Doyle responded, "You." Defendant said, "Oh, what's wrong with me?" and Detective Doyle laughed and said, "Nothing's wrong with you." Defendant asked if he was in trouble, and Detective Doyle responded, "You're not in trouble." Defendant said, "Oh, okay," and Detective Doyle repeated, "You're not in trouble." Mr. Flatt stepped back into the building's vestibule, leaving the front door of the building open, and Detective Doyle followed him into the vestibule. The dog, which was not barking, approached the vestibule and either Mr. Flatt or defendant stated that they "have a dog." Detective Doyle said, "Yup, that's fine. Yeah. Do you want to put the dog up?" Either Mr. Flatt or defendant said, "Yeah." Detective Doyle may have said, "Here, I don't want to take him," and either Mr. Flatt or defendant said, "One second. I'm sorry," as someone partially closed the front door of the building. Detective Doyle could be heard saying, "Yeah," to the dog.

¶ 10 Meanwhile, Detective King stood outside at the threshold of the building with his head leaning into the vestibule and watched through the partially open front door of the building as Mr. Flatt or defendant attended to the dog. Officer Diaz stood behind Detective King, on the outside landing. When the dog was removed from the area, Detective King pushed the front door of the building open wider and joined Detective Doyle in the vestibule. Officer Diaz followed him. Through the open door of the residence was a view of the open-floor-plan kitchen, dining room, and living room. Detectives Doyle and King looked down as they wiped their feet on a doormat

- 4 -

outside the residence and crossed the threshold of the open door into the residence. According to the BWC recording, Detective Doyle was in the vestibule about 17 seconds before she and Detective King crossed the threshold into the residence. Defendant was standing between the kitchen and dining room, at the head of the dining room table. Detective Doyle asked, "You mind if we sit down?" and defendant responded, "Yeah, go for it. My heart is racing." Officer Diaz also entered the residence and closed the door.

¶ 11    Detective Doyle sat at the dining room table and told defendant it was up to him if he wanted Mr. Flatt in the room. Defendant responded, "I'm not sure. He'll probably come in." Mr. Flatt reentered the dining room carrying a dog leash, turned on the lights above the dining room table, and sat on a bench across from the table. Detective King sat at the table and Officer Diaz remained standing by the door. Defendant sat at the head of the table and remained there for the duration of his conversation with the officers.

¶ 12    Detective Doyle asked defendant to verify his email address and phone number, which he did. Defendant asked if he was going anywhere with the officers and Detective Doyle said, "No." Mr. Flatt asked if he was needed for this conversation, and Detective Doyle said that he was not. Mr. Flatt asked defendant if he wanted privacy, and defendant responded that it was up to Mr. Flatt if he wanted to stay. Mr. Flatt initially stayed but shortly after the questioning began defendant said something to him. Then, Mr. Flatt said, "Okay, I'll go." Mr. Flatt put the dog leash on the kitchen counter as he left the room. Detective Doyle questioned defendant about the November 2021 Instagram conversation between user "jcronin1897" and user "rope_homo_." Mr. Flatt reentered the kitchen, retrieved the dog leash from the kitchen counter, and left the room. Detective Doyle laid out the nature of the Instagram conversation and read several messages out loud, which

contained the elicit discussion of child sexual abuse and child pornography. She presented a photograph of a penis to defendant, and he confirmed that it was a photograph of his penis. He told Detective Doyle that he had no memory of the alleged conversation and did not recall sending those messages.

¶ 13    Detective Doyle asked defendant how he accessed Instagram, and he responded that he usually used his cellphone. She asked where that cellphone was, and he answered that he had it with him. Detective Doyle told him to produce his cellphone and, when he hesitated, told him he did not have a choice. Defendant removed his cellphone from the pocket of his shorts, and Detective Doyle said, "I'll take that." Defendant looked at the screen for one-half of a second and tapped the screen with his thumbs. Detective Doyle tried to take the phone out of his hand, but he resisted, so Detective Doyle took the cellphone from him using both of her hands. While she did so, Detective King told defendant not to resist. Defendant said that he thought he was not in trouble, and Detective Doyle responded that he was not in trouble but the cellphone was evidence and she was going to take it. Detective Doyle asked defendant about certain statements concerning child abuse in the November 2021 Instagram conversation, and defendant said that the statements did not sound like anything he would say or think but he had a "drug problem" at the time and was addressing it.

¶ 14    Detective Doyle asked defendant for his cellphone passcode and whether his cellphone contained child pornography. Defendant responded that he did not know what other people might have sent him and worried that there might be "17-year-old stuff" on his cellphone. Detective Doyle said that she did not care about "17-year-old stuff" or drug use; she was concerned about pornography involving toddlers and small children. Defendant responded that he did not know

whether people had sent him unsolicited child pornography and was concerned that his phone contained confidential work information. Detective Doyle said that she was taking the cellphone and would write a warrant to search it, but defendant would get it back quicker if he signed a consent-to-search form. Defendant said that he needed his phone, and Detective Doyle asked him if he wanted to give her the passcode and she would look through his cellphone now. Defendant declined and said that he was just trying to protect his rights. Detective Doyle explained that she was taking the phone and would get into it after she obtained a warrant. Defendant said that he did not understand how the officers could take his cellphone, and Detective Doyle explained that defendant had committed a Class 4 felony using his cellphone and the officers had probable cause to seize it and obtain a warrant to search it.

¶ 15    Detective Doyle again asked defendant if his cellphone contained child pornography, and defendant said he did not know and would have blackouts due to his drug problem. Defendant also did not know what other people may have sent him. Meanwhile, Detectives Doyle and King repeatedly manipulated the screen of the cellphone. Defendant said he did not see the benefit of giving them his passcode and did not understand the "process" and "ramifications." Detective Doyle said that it was fine if defendant did not want to give them the passcode, but he would get his cellphone back in a couple of days instead of a couple of months if he provided the passcode. The detectives again explained that they had probable cause to take the cellphone and to obtain a search warrant for it.

¶ 16    Defendant said that he did not know what to do because the cellphone contained things other people had sent him and certain people online had blackmailed him. Detective Doyle asked defendant if he had ever met up with minors in person or sexually assaulted children, which

defendant denied. Detective Doyle said she thought defendant had a "kink" about 14 to 16 year olds and wanted to be manhandled by them, and defendant said that was just a "fantasy thing" and not something he actually wanted to do. Detective Doyle asked defendant how he wanted to proceed, and defendant said that he wanted to be helpful but did not want to go to jail. Detective Doyle said that she had to see what kind of pornography was on his cellphone before she could tell him whether he was going to jail. Detective Doyle again asked him if pornography involving toddlers or babies was on his cellphone, and defendant responded "one or two" that were sent to him by other people. Then, defendant gave the detectives his passcode and signed the consent-to-search form. Prior to defendant signing that form, Detective Doyle reviewed it with him, informing him that he did not have to agree to a search of his cellphone. He was shaking and nervous when Detective Doyle reviewed the form with him. She reassured him repeatedly that he was not a "bad guy," gave him her business card and phone number, and told him to call her with any questions. Detective Doyle ended the interaction and left defendant's home.

¶ 17 The officers later obtained a search warrant for the cellphone and then searched the cellphone pursuant to that warrant. Based on the evidence found on the cellphone, defendant was arrested on August 29, 2022, on charges of possession of child pornography and distribution of harmful material.

¶ 18 On April 3, 2023, defendant moved the court to suppress evidence and statements from the August 22, 2022, interaction on the grounds that the officers (1) lacked a warrant or consent to enter defendant's home, (2) failed to give him *Miranda* warnings prior to him making incriminating statements during the custodial interrogation, (3) lacked probable cause or a search

warrant to seize his cellphone, and (4) illegally coerced him to sign the consent-to-search form and give the detectives his cellphone passcode.

¶ 19    The State responded that defendant consented to the officers entering his home, defendant was not placed under arrest and his freedom of movement was not restricted in any way, probable cause and exigent circumstances justified the officers' search and seizure of the cellphone, and defendant voluntarily consented to the search of his cellphone.

¶ 20    The hearing on defendant's motion to suppress was held on July 24 and October 19, 2023.

¶ 21    Defendant was 38 years old at the time of the hearing and had a bachelor's of science degree. He testified that when he and Mr. Flatt entered their residence to put the dog away, they headed down a long hall toward a back bedroom and defendant lost sight of Detective Doyle. It sounded like she was walking inside the residence, so defendant left Mr. Flatt and started to walk back toward the front of the residence. When he got to the front, Detectives Doyle and King were inside. Defendant was not asked for, nor did he provide, the officers with consent to enter his home. He felt threatened and intimidated throughout the entire encounter. He interpreted several of Detective Doyle's statements as commands rather than requests, and Officer Diaz's presence blocking the front door gave him the impression that he was barricaded inside his home and trapped at his dining room table. When defendant removed his cellphone from his pocket, he quickly looked at it for notifications and pressed a side button to turn it off or "disengage the screen" before Detective Doyle grabbed it from his hands. Detective Doyle asked for his cellphone passcode about 10 times, and he asked about the officers needing a warrant 3 or 4 times. When he eventually gave the officers his passcode, he felt like he had no other option because he used his cellphone for work, monitoring his glucose, and paying bills.

¶ 22    Mr. Flatt testified that he did not invite the officers into his home and they never asked him for permission to enter. Mr. Flatt described Detective Doyle's actions as "dominating his space" and said that he was forced to have a conversation with her. Also, she told him to put the dog up, and he felt like he had no choice but to do so. Detective Doyle remained in the vestibule while Mr. Flatt and defendant entered their residence and walked the dog toward the back bedroom. The whole process took about 45 seconds, and Mr. Flatt did not expect the officers to enter his residence. When Mr. Flatt returned after putting the dog in the bedroom, Detectives Doyle and King were already seated at the dining room table with defendant. Mr. Flatt felt that the interaction with the officers was intimidating and deceitful.

¶ 23    The defense rested and moved for a directed finding, which the trial court denied.

¶ 24    Detective Doyle testified about how she obtained defendant's name and information through an Arizona law enforcement agency's cyber tip. She acknowledged that she did not have a warrant and did not ask for permission to enter defendant's home. She testified that, while she was standing in the vestibule, she did not tell Mr. Flatt to put the dog away because she loves dogs. Rather, Mr. Flatt asked if they could "put the dog up." She testified that when she waited in the vestibule while Mr. Flatt and defendant moved into the residence with the dog, they left her line of sight and did not give her specific verbal permission to enter their residence. She also testified that "[t]hey came back to the door and escorted us in." When defendant said that he used his cellphone to access his Instagram account, she believed that he had committed the crime of distribution of harmful materials and wanted his cellphone as evidence. When she asked defendant to produce his cellphone, he took it out of his pocket but did not give it to her. Instead, he started tapping on the screen with his thumbs. She believed that he might be trying to delete evidence, so

she took the cellphone out of his hands. She and Detective King attempted to put the cellphone on airplane mode so that potential evidence could not be deleted remotely. She did not search the cellphone on the scene. Later, she wrote a search warrant for the cellphone, and after obtaining a judge's signature, she executed the warrant and searched defendant's cellphone on August 25, 2022.

¶ 25    The trial court denied defendant's motion to suppress statements and evidence, ruling that (1) defendant consented to the officers' entry into his home, (2) *Miranda* warnings were not required because the interaction between defendant and the officers was noncustodial, (3) the seizure of defendant's cellphone was valid pursuant to probable cause and exigent circumstances, and (4) although defendant's consent to search his cellphone was not given voluntarily, the evidence recovered from the cellphone was admissible under the inevitable discovery doctrine.

¶ 26    First, the trial court found that it was very clear from the BWC recording that defendant and Mr. Flatt gave the officers consent to enter the home because when the officers approached the door, defendant and Mr. Flatt were both in the doorway and both moved out of the way for the officers, allowing them entry into the home. Defendant and the detectives walked over to the table and the detectives asked if they could sit at the table and defendant said, "Yeah, go for it." Moreover, removing the dog from the area was consistent with allowing the officers into the home.

¶ 27    Second, the trial court found that the officers were not required to give defendant the *Miranda* warnings because he was not in custody during the police interrogation inside his residence. Specifically, defendant was a well-educated professional; the interview lasted a short amount of time; defendant was not subjected to physical restraints; the interview occurred during the daytime at defendant's home; the officers never presented their weapons; and defendant's

partner was allowed to stay in the room during the interview, just a few feet away from defendant. Moreover, Mr. Flatt left during the interview of his own volition.

¶ 28    Third, the trial court found that the warrantless seizure of defendant's cellphone was reasonable because there was probable cause to believe that the cellphone contained evidence of a crime since defendant confirmed that he had used his Instagram account to send a naked picture of his penis to a 17-year-old person and usually accessed his Instagram account with his cellphone. Moreover, exigent circumstances existed to prevent the destruction of evidence because defendant began manipulating the screen of his cellphone after the officers told him to produce it.

¶ 29    Fourth, the trial court found that defendant did not voluntarily disclose his cellphone passcode or voluntarily sign the consent-to-search form because he expressed his concerns about disclosing his passcode, reiterated his belief that the detectives needed a warrant, and explained that his cellphone contained confidential work information. Moreover, the detectives gave defendant "troubling" responses, including that they could get a search warrant with absolute certainty and defendant's cellphone would be returned faster if he disclosed the passcode. However, the trial court concluded that the evidence, which was obtained after the issuance of the search warrant, would not be suppressed pursuant to the doctrine of inevitable discovery because the search warrant negated and attenuated defendant's initial unlawful consent.

¶ 30    The matter proceeded to a stipulated bench trial, at the conclusion of which the court found defendant guilty of 15 counts of possession of child pornography. Defendant filed a motion for a new trial and to reconsider the finding of guilt, arguing, *inter alia*, that the court erred by denying his motion to suppress evidence and statements. The court denied defendant's posttrial motion and

sentenced him to four years' sex offender probation and required him to register as a sex offender for life. Defendant timely appealed.

¶ 31                                    II. ANALYSIS

¶ 32     Defendant argues that the trial court erred by denying his motion to suppress evidence. He contends that the officers' warrantless entry into his home was a clear violation of his constitutional rights, where the officers lied to him on the steps of his home when they told him he was not in any trouble, cajoled him into placing his dog into another room, and then entered his home without a warrant and without permission. Defendant also contends that, once inside, the officers seized his cellphone without a warrant, coerced him into signing the consent-to-search form, and violated his rights per *Miranda*. Defendant argues that the trial court made factual findings that were against the manifest weight of the evidence, disregarded relevant case law, and otherwise erred in its findings.

¶ 33     On review of a suppression ruling, we conduct a two-step process. First, we defer to the trial court's factual findings and will reverse them only if they are against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). A finding is against the manifest weight of the evidence only where an opposite conclusion is clearly evident from the record. *People v. Feddor*, 355 Ill. App. 3d 325, 330 (2005). Second, on appeal, this court "remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted." *Luedemann*, 222 Ill. 2d at 542. Thus, "we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." *Id.* We may affirm the trial court's ruling "on any basis appearing in the record, whether or not the trial court relied on that basis, or its reasoning was correct." *People v. Daniel*, 2013 IL App (1st) 111876,

¶ 37.

¶ 34     When a defendant files a motion to suppress evidence, he bears the burden of making out a *prima facie* case that the evidence obtained was the product of an unreasonable search. *People v. Brooks*, 2017 IL 121413, ¶ 22. If the defendant does so, the burden shifts to the State to present evidence showing, by a preponderance of the evidence, that the search was constitutionally valid. *Id.*; *Village of Gurnee v. Gross*, 174 Ill. App. 3d 66, 69 (1988). The ultimate burden of proof, however, rests with the defendant. *Brooks*, 2017 IL 121413, ¶ 22.

¶ 35                  A. Entry Into The Home

¶ 36     Defendant met his initial burden of making out a *prima facie* case of an unreasonable search. That is, it is undisputed that the police entered defendant's home without a warrant. The Supreme Court has long held, as "a 'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). Our Illinois Supreme Court has also held the same. *People v. Bull*, 185 Ill. 2d 179, 196-97 (1998) ("The fourth amendment prohibits the warrantless search of a person's home as *per se* unreasonable."). Indeed, "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh*, 466 U.S. at 748 (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)).

¶ 37     With defendant's *prima facie* case established, the burden shifted to the State to demonstrate by a preponderance of the evidence the constitutionality of the search. *Brooks*, 2017 IL 121413, ¶ 22; *Gross*, 174 Ill. App. 3d at 69. The State can carry that burden by proving the existence of "a few specifically established and well-delineated exceptions to the warrant

requirement." *Bull*, 185 Ill. 2d at 197. For example, "a search authorized by consent is wholly valid" even absent a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). In establishing the consent exception for the warrantless search, "the State bears the burden of proving the consent was truly voluntary." *People v. Anthony*, 198 Ill. 2d 194, 202 (2001). Consent is voluntary if it is given "absent any coercion, express or implied" (*People v. Kratovil*, 351 Ill. App. 3d 1023, 1030 (2004)), and is not the product of any intimidation or deception (*People v. Prinzing*, 389 Ill. App. 3d 923, 932 (2009)). "While some forms of deception may not invalidate the consent, we must review the voluntariness of the consent in light of traditional notions of fairness and society's needs for effective police investigations." *Id*. The voluntariness of consent depends on the totality of the circumstances. *People v. Daugherty*, 161 Ill. App. 3d 394, 399 (1987).

¶ 38     "The defendant may convey consent to search by nonverbal conduct [citations], but mere acquiescence to apparent authority is not necessarily consent [citations]." *Anthony*, 198 Ill. 2d at 202. Consent by nonverbal conduct "should be unmistakenly clear." *Id*. at 203. Examples of unmistakenly clear nonverbal gestures conveying consent include stepping away after opening a door, stepping aside so that the person outside may pass inside, a wave of the hand, a nod of the head (*People v. Schreiner*, 2021 IL App (1st) 190191, ¶ 53), or the defendant beginning a conversation with the police as they stood outside his apartment, then walking away from the still-open front door, moving into his kitchen, and sitting down at the table while continuing to converse with the police (*People v. Gross*, 166 Ill. App. 3d 413, 424 (1988)); but see *Schreiner*, 2021 IL App (1st) 190191, ¶¶ 7-10, 22, 55 (no unmistakenly clear nonverbal consent to police entry into the home where the police opened the outer glass storm door and pounded on the main front door at night; the homeowner, in her pajamas, opened the main front door and may have held the storm

door open while she spoke to the police, who told her to get her driver's license; she left the main front door open when she went to her bedroom to retrieve her driver's license; and the police entered her home in her absence)).

¶ 39    Defendant argues the trial court improperly determined that the State met the shifted burden of proving that consent to enter defendant's residence was voluntarily given. Although defendant told Detective Doyle, "Yeah, go for it," when she asked to sit at the table, defendant made that statement after the detectives' nonconsensual entry into his home. Furthermore, defendant and Mr. Flatt testified that they felt that they had no choice once the officers were inside. Defendant also argues that it was impossible for Detective Doyle to see defendant or Mr. Flatt when she entered the residence; she had to duck her head and peek around the corner to see where defendant was standing. Moreover, defendant was putting the dog away with Mr. Flatt and returned to the front door when he heard the officers already inside the residence. Defendant asserts that the dog was barking loudly and making a commotion when the officers spoke to defendant in the vestibule. Defendant contends that he and Mr. Flatt obeyed when Detective Doyle told them to put the dog up, and the officers entered only when the two residents were out of view. Defendant also contends that putting the dog away was not a manifestation of their intent to allow the officers to enter, and he and Mr. Flatt did not walk away from the door to continue the conversation inside.

¶ 40    In this case, we conclude that the trial court properly determined that, under the totality of the circumstances, defendant and Mr. Flatt voluntarily consented to the officers' entry into their home. In making its determination, the trial court relied heavily on the BWC recording. The recording shows that Detective Doyle informed defendant that the officers were at his home for an investigation and they needed to talk to him. When Mr. Flatt and defendant answered the front

door, Detective Doyle said that they probably did not want her to discuss the matter on their front porch due to the nature of the discussion, and either Mr. Flatt or defendant responded, "Ok." Then, Mr. Flatt moved from the landing, into the vestibule, and then into the residence, while defendant moved from the vestibule into the residence. They moved to continue the discussion, pausing to attend to their dog, which had approached the vestibule. Detective Doyle followed them through the open front door of the building, paused in the vestibule for about 17 seconds while they attended to their dog, and then walked through the open door to their residence, which is immediately to the right of the building's front door.

¶ 41    The recording refutes defendant's assertion that the dog was barking while Detective Doyle was in the vestibule and she ordered Mr. Flatt and defendant to put their dog away. The recording also refutes defendant's assertion that he was out of view when the officers crossed the threshold into the residence. As she entered the residence, Detective Doyle asked defendant, who was standing by the dining room table, if the detectives could sit down, and defendant responded, "Yeah, go for it." Furthermore, the recording does not indicate that Mr. Flatt and defendant were merely acquiescing to police authority; the interaction between the officers and Mr. Flatt and defendant was calm and cordial. Here, the trial court's conclusion that consent was given was not manifestly erroneous, because both verbal and nonverbal consent were given. As such, an exception to the warrant requirement existed here, and the officers' entry was lawful.

¶ 42    Defendant argues that any alleged consent to enter was tainted by police deception because Detective Doyle lied to defendant when she was outside the building. Specifically, defendant contends that Detective Doyle misled him when he asked her several questions to ascertain the purpose of her visit and she said that he was not in any trouble. Defendant asserts that Detective

Doyle was at his residence for the sole purpose of gathering statements and additional evidence from him regarding child pornography.

¶ 43    Although some forms of deception by police to obtain a consent may not invalidate it, the "fairness" of the type of deception used is relevant to the determination of the consent's validity. *Daugherty*, 161 Ill. App. 3d at 399 (citing 3 W. LaFave, Search & Seizure: A Treatise On the Fourth Amendment, § 8.2(n) (1987)). " '[T]he concept of voluntariness must accommodate a complex of values ranging from society's need for effective police investigations to fundamental notions of fairness.' " *Id.* (quoting *People v. Moore*, 105 Ill. App. 3d 264, 268 (1981)). If the "overpowering" motive of the police who use subterfuge to obtain consent is "evidence-finding," "then the police conduct offends the fourth amendment." *Id.*; compare *People v. Cooney*, 136 Ill. App. 3d 989, 993-94 (1985) (where the police were investigating a murder but informed the defendant's mother that they wanted to talk with the defendant about an "incident," this type of deception did not vitiate the mother's voluntary consent to enter the premises), with *Daugherty*, 161 Ill. App. 3d at 400 (police deception was so unfair as to be coercive and render the consent to enter the premises invalid where the officer used his official position of authority and falsely claimed that he had legitimate police business to conduct when in fact the theft investigation had concluded and the officer's real reason for entry was to search inside for evidence of marijuana).

¶ 44    We reject defendant's argument that deception vitiated the consent to enter the residence. Here, the officers were conducting legitimate police business, *i.e.*, a pending investigation, when they obtained consent to enter defendant's home. Detective Doyle was not deceptive about the reason why the officers were at defendant's home. She told him that they needed to speak to him about an investigation involving him, and the topic of the investigation was not "great" and should

not be discussed outside on the building's front steps. As noted by the trial court, when the police arrived at defendant's home, they did not have a basis to believe with certainty that he was the person who had committed the offense of distribution of harmful material, *i.e.*, the photograph of a penis, until they actually had a conversation with defendant. Therefore, when Detective Doyle answered defendant's question by responding that he was not in trouble, her answer was not deceptive because the police did not have confirmation of his involvement in distributing harmful materials.

¶ 45    Moreover, Detective Doyle was not required to give defendant every piece of information she possessed while investigating the matter of distribution of harmful materials. See *People v. Prinzing*, 389 Ill. App. 3d 923, 934 (2009) (where the detective was investigating both fraudulent charges to the defendant's credit card and his alleged purchase of child pornography over the Internet, and the detective did not tell the defendant about the potential for child pornography purchases when the detective obtained consent to search the defendant's computer for viruses, the detective "was not required to provide defendant with every piece of information that he possessed while investigating the matter" and any use of trickery did not necessarily render the defendant's consent involuntary).

¶ 46    Based on the totality of the circumstances, we conclude that the trial court's finding that defendant and Mr. Flatt gave the officers voluntary consent to enter the residence was not against the manifest weight of the evidence.

¶ 47                                B. Custodial Interrogation

¶ 48     Defendant argues that the officers turned his residence into an interrogation room, so he was in custody at the time of the interview and entitled to *Miranda* warnings, which the officers did not give him.

¶ 49     In *Miranda*, the United States Supreme Court held that, prior to the start of an interrogation, a person being questioned by law enforcement officers must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," as long as that person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. The finding of custody is essential, as the pre-interrogation warnings required by *Miranda* are intended to assure that any inculpatory statement made by a defendant is not simply the product of " 'the compulsion inherent in custodial surroundings.' " *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004) (quoting *Miranda*, 384 U.S. at 458). Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. *Miranda* requires the suppression of all unwarned custodial statements that were involuntary or were elicited through police interrogation. *People v. Jones*, 2024 IL App (2d) 220327, ¶ 27.

¶ 50     Several factors relevant in determining whether a statement was made in a custodial setting include "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force,

physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *People v. Slater*, 228 Ill. 2d 137, 150 (2008). "Other factors that courts have deemed relevant to the custody analysis include 'whether and to what extent the person has been made aware that he is free to refrain from answering questions' and 'the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed.' " *People v. Logan*, 2024 IL 129054, ¶ 60 (quoting *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996)). To determine whether a person is in custody for *Miranda* purposes, the court must consider and weigh all the factors and then make an objective determination as to whether a reasonable person, innocent of wrongdoing, would have believed that he or she was not in custody, but rather free to terminate the questioning and leave. *In re D.L.H., Jr.*, 2015 IL 117341, ¶ 51; *People v. Braggs*, 209 Ill. 2d 492, 505-06 (2003).

¶ 51    Here, Detective Doyle's questioning of defendant at the dining room table constituted an interrogation because her questions were "likely to evoke an incriminating response." *People v. Tayborn*, 2016 IL App (3d) 130594, ¶ 18. Prior to the interrogation, the officers did not issue *Miranda* warnings. Thus, the issue is whether the trial court properly determined that defendant was not in custody at the time of the interrogation, which determination we review under the manifest weight of the evidence standard. *People v. Fasse*, 174 Ill. App. 3d 457, 461 (1988).

¶ 52    The trial court correctly found that the circumstances were clearly noncustodial and therefore, *Miranda* warnings were not required. The interrogation occurred at defendant's home in the afternoon and lasted about 30 minutes. Although three officers were present, Detective

Doyle asked most of the questions, Detective King asked only a few, and Officer Diaz did not question defendant at all. Defendant's partner was present and sitting near defendant at the beginning of the questioning, but left of his own accord. The tone of the interview was conversational and cordial, and the officers never unholstered their weapons, raised their voices, or used threatening language. At the time, defendant was about 37 years old and a professional with a college degree. He was not handcuffed or otherwise restrained. When defendant asked Detective Doyle if he was going to be arrested, she told him no. Later, after defendant made inculpatory statements, she told him that the existence of child pornography on his cellphone would determine whether he would eventually be arrested. She reassured him repeatedly that he was not a "bad guy," gave him her card and phone number, and told him to call her with any questions. The trial court correctly concluded that a reasonable person, innocent of wrongdoing, would not have believed that he was in custody. This finding is not against the manifest weight of the evidence.

¶ 53    Defendant argues that the interrogation was custodial because the three officers were armed, defendant understood that he was the subject of their investigation, Officer Diaz stood near the door in a "barricading manner," and the detectives' words and actions led defendant to believe that he had no choice but to speak with them. Defendant's argument lacks merit because his belief at the time is not determinative; the relevant inquiry is an objective test based on a reasonable person innocent of wrongdoing. *In re D.L.H.*, 2015 IL 117341, ¶ 50. Furthermore, Officer Diaz's location near the door was a good position for him to record the entire group at the dining room table and did not barricade defendant or prevent his movement in his home. Also, Detective Doyle did not threaten defendant with being arrested that day.

¶ 54                                C. Cellphone Seizure

¶ 55    Defendant argues that the warrantless seizure of his cellphone was unlawful because no probable cause warranted the officers' beliefs that he had violated the law and evidence of it was in his residence, and no exigent circumstances existed to warrant the officers' belief that he would immediately destroy the evidence. He argues that the trial court's findings to the contrary were against the manifest weight of the evidence. Specifically, he states that he did not confirm to Detective Doyle that he sent the photograph of his penis to the 17-year-old person. Rather, defendant confirmed only that it was his penis in the photograph but he did not remember sending the photograph or engaging in the Instagram conversation due to his drug use. Furthermore, he touched his cellphone for only a few seconds before Detective Doyle grabbed it from his hand; he was not attempting to destroy evidence. Also, Detective Doyle never stated at the time of the interaction any concern that he might attempt to destroy evidence, and she never confirmed that the cellphone she seized in August 2022 was the same one defendant owned in November 2021.

¶ 56    "[A] seizure is lawful only when the owner of the property consents to the seizure, there is a valid warrant for its seizure or the police are lawfully present and there is probable cause to believe the property is contraband, stolen property, or evidence of a crime." *People v. Blair*, 321 Ill. App. 3d 373, 380 (2001). "Probable cause exists where the evidence known to the officer raises a 'fair probability that contraband or evidence of a crime will be found in a particular place.' " *People v. Molina*, 2024 IL 129237, ¶ 22 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The ultimate test of the constitutionality of a seizure is reasonableness. *People v. Cohen*, 146 Ill. App. 3d 618, 622 (1986).

¶ 57    We conclude that the trial court properly determined that probable cause was established when defendant acknowledged that he used his cellphone to access his Instagram account and the photograph sent during the November 2021 Instagram conversation with the 17-year-old person was a picture of defendant's penis. These admissions, in combination with facts already known to the detectives from previous search warrant returns from Instagram, and information obtained by the Center for Missing and Exploited Children and the Arizona police department demonstrated probable cause to seize defendant's cellphone as evidence of the crime of distribution of harmful materials.

¶ 58    We also conclude that the trial court properly determined that exigent circumstances also justified the seizure. Exigent circumstances, including destruction of evidence, are an exception to the warrant requirement (*Welsch v. Wisconsin*, 466 U.S. 740, 749 (1984)), but "the police 'must have particular reasons to believe that the evidence will be destroyed' before exigent circumstances will arise" (*People v. Hassan*, 253 Ill. App. 3d 558, 572 (1993) (quoting *People v. Patrick*, 93 Ill. App. 3d 830, 833 (1981)). Here, exigent circumstances arose that gave the officers particular reasons to believe that evidence would be destroyed. Specifically, after defendant's admissions about his Instagram account and using his cellphone to access it, he began tapping the screen after he removed his cellphone from his pocket, and Detective Doyle believed he may have been trying to destroy evidence and immediately seized the phone. Then, the detectives tried to secure the cellphone by placing it on "airplane mode" to prevent the remote destruction of evidence. Moreover, the cellphone was not searched until after Detective Doyle obtained a warrant to search it. *Cf. People v. Butler*, 2015 IL App (1st) 131870, ¶¶ 30, 44, 47 (no exigent circumstances existed

where the police seized the defendant's cellphone and immediately searched its contents instead of securing the cellphone and obtaining a warrant before searching it).

¶ 59                                    D. Inevitable Discovery

¶ 60    The trial court found that after the detectives seized defendant's cellphone, his disclosure of his cellphone passcode and signing of the consent-to-search form were not valid because the detectives obtained them through coercion. However, the trial court determined, pursuant to the inevitable discovery doctrine, that suppression of the evidence obtained from the cellphone was not warranted because the officers did not search the cellphone based on either the passcode or signed consent form, but rather based on a signed search warrant.

¶ 61    "The 'inevitable discovery doctrine' was developed as an exception to the exclusionary rule, which requires exclusion from use at a criminal trial illegally obtained evidence." *People v. Edwards*, 144 Ill. 2d 108, 143 (1991). The inevitable discovery doctrine provides "that evidence obtained in violation of a defendant's constitutional rights and which otherwise would be inadmissible at trial may be admitted if the prosecution is able to show that the challenged evidence 'would inevitably have been discovered without reference to the police error or misconduct.' " *Id*. at 142 (1991) (quoting *Nix v. Williams*, 467 U.S. 431, 448 (1984)).

¶ 62    Defendant argues that the inevitable discovery doctrine does not apply because the information the officers used to secure the warrant was obtained after their unlawful entry into defendant's home and during the custodial interrogation where they did not give him the *Miranda* warnings.

¶ 63    Defendant's argument fails because, as discussed above, we have concluded that the officers had consent to enter the home and any admissions defendant made occurred during a

noncustodial interrogation. Moreover, the search warrant was not based on anything the officers saw on the cellphone during an improper search because they did not search the cellphone prior to executing the warrant. Furthermore, pursuant to that search warrant, the images of child pornography would have inevitably been discovered without reference to the officers' coercive misconduct or error concerning the passcode and signed consent-to-search form. Consequently, we conclude that the trial court's admission of the evidence on defendant's cellphone was not error.

¶ 64                                    III. CONCLUSION

¶ 65     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 66     Affirmed.